STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. ONE (1) 1979 CHEVROLET CAMARO Z–28 BEARING NEW JERSEY REGISTRATION 447–UAB AND U.S. CURRENCY IN THE SUM OF ONE THOUSAND FOUR HUNDRED FORTY ($1440.00) DOLLARS, DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 8, 1985—Decided June 13, 1985.

Fritz, P.J.A.D., concurred and filed opinion.

Before Judges FRITZ and LONG.

*Barry N. Lozuke,* Deputy 1st Assistant Prosecutor argued the cause for appellant (*Alvin G. Shpeen,* Gloucester County Prosecutor, *Jean Blanken Ramsay,* Assistant Prosecutor, of counsel and on the letter brief).

*Samuel H. Bullock* argued the cause for respondent (*Bullock & Borelli,* attorneys; *Samuel H. Bullock* on the brief).

The opinion of the court was delivered by

LONG, J.A.D.

The State here challenges an order of the trial judge denying its motion for forfeiture of a 1979 Chevrolet Camaro and $1,440 in cash and directing their return to their owner, James Bruno,

Sr. We affirm the order insofar as the automobile is concerned and reverse as to the currency.

The case arose when the State filed a complaint pursuant to *N.J.S.A.* 2C:64–1 seeking forfeiture of a 1979 Chevrolet Camaro and $1440 belonging to Bruno on the basis that he had been charged with violating the Controlled Dangerous Substance laws. The complaint alleged that upon execution of a search warrant numerous types of controlled dangerous substances and drug paraphernalia were found in the motor vehicle which had been used to transport a large quantity of methamphetamine, and that the $1440 was found in Bruno's possession, "together with a substantial amount of methamphetamine and a written record of drug transactions." Bruno filed an answer in which he admitted ownership of the Camaro but denied all else.

The facts which gave rise to the filing of the complaint are as follows: On the evening of June 23, 1983, after a lengthy investigation of Bruno, police obtained a search warrant covering Bruno's person, his residence in Turnersville, and his 1979 Chevrolet Camaro. Thereafter they searched Bruno's home and seized the following drug-related materials and paraphernalia:

Two clear plastic bags containing numerous green and white capsules.
One clear plastic bag containing a white powder substance.
One metal pan containing marijuana, seeds and stems, and burned marijuana cigarettes.
One Ohaus triple beam scale.
Numerous plastic bags (odor and residue of marijuana).
One blue plastic container, containing one spring balance scale.
One black plastic film canister with gray lid containing numerous red/white capsules.
Two pages off kitchen calendar containing numerical calculations.
One clear plastic bag containing marijuana.

The green and white capsules were later identified by the New Jersey State Police Laboratory as drug look-alikes containing a harmless substance. There is no indication in the record that the white powder substance in the plastic bag was identified.

The red and white capsules found in the black plastic film canister were identified as flurazepam, a controlled dangerous substance marketed as a sleep remedy under the name Dalmane.

Later that evening, the officers found Bruno at a local diner where they executed the search warrant as to Bruno's person and the car. Among the items found on his person were a clear plastic bag containing .55 grams of methamphetamine, $1,440 in U.S. currency and a black pocket calendar. During the search of the Camaro, the police found a Marlboro cigarette pack which contained 19 pink pills and 15 green and white capsules, later identified as look-alikes, and .86 grams of hashish. Also found in Bruno's car was his leather wallet, which contained two pieces of paper with numerical calculations and letters representing the initials of individuals. During the search Bruno's checkbook with a balance of approximately $65,000 was also discovered.

At the forfeiture hearing witnesses for the State and for Bruno elaborated on the items seized from Bruno's person and from his car. Investigator Francis Burke of the Washington Township police testified that the pieces of paper were "records of the distribution of controlled substances and the money received from controlled substances." From the papers found in Bruno's wallet, however, Burke was unable to say whether Bruno was selling drugs on the night of June 23, 1983. Investigator Johnson of the Monroe Township Police testified that the calendar contained names which he recognized as belonging to people with whom Bruno was suspected of having drug dealings. He stated that look-alikes such as those found in Bruno's home and car were sold to the unwary as controlled dangerous substances. Johnson also testified that the $1440 was found in a white paper bag wrapped around the methamphetamine in Bruno's right front pocket. Johnson stated that there was only enough methamphetamine for a single use, but that this was nevertheless a distributable quantity, with a value of $30 to

$35. Johnson further stated that the quantity of hashish was small and intended for personal use as well.

During his testimony on these subjects, Bruno admitted that the methamphetamine belonged to him and stated that it was for his personal use. He also admitted that he had been engaged in selling methamphetamine and in obtaining large quantities of methamphetamine, marijuana and quaaludes from a local drug trafficker, but denied that he had been selling drugs on the night in question. In addition, he maintained that the look-alikes which he sometimes sold (but never from his car) were caffeine intended for his own personal use to "keep him going." He explained the large sum of money in his checkbook as follows: insurance payments as a result of an automobile accident in 1981, savings from the two jobs he worked for 15 years and the proceeds from the sale of his home upon his divorce from his wife. Bruno also attributed the $1440 found in his pocket to recently cashed insurance checks and claimed that the money had been found in a different pocket than the methamphetamine. At the time the $1440 was discovered Bruno gave no explanation as to why it was in his possession.

The Gloucester County Grand Jury returned a four-count indictment against Bruno. The first count of the indictment charged him with possession of methamphetamine, contrary to *N.J.S.A.* 24:21–20(a)(1). The second count charged him with possession of methamphetamine with intent to distribute, contrary to *N.J.S.A.* 24:21–19(a)(1). The third count charged him with possession of Dalmane (flurazepam), contrary to *N.J.S.A.* 24:21–20(a)(1). The fourth count charged him with possessing look-alikes with intent to distribute, contrary to *N.J.S.A.* 24:21–19.1(a)(3). He was also charged with the nonindictable offense of possessing less than five grams of hashish, contrary to *N.J.S.A.* 24:21–20(a)(4). Pursuant to a plea bargain Bruno pled guilty to Counts I, II and III, while Count IV and the hashish charge were dismissed. He was sentenced to two years of probation on Count II and a fine of $500 payable over the probationary period in equal monthly installments. On Counts

I and III he was sentenced to two years of probation to run concurrently with the sentence on Count II. He was assessed a $25 penalty on each count payable to the Violent Crimes Compensation Board.

On this evidence the trial judge found that the pills, hashish and methamphetamine were for Bruno's own personal use, not for sale, and concluded that mere possession did not constitute grounds for forfeiture under the statute. With respect to the $1440 found with the methamphetamine, the judge stated:

There is no testimony of any sale of this. Consequently, because of the small amount, as far as the money was concerned, that has not been tied to any sale of any narcotic or any illegal drug, although there was some testimony as to its being found with a small quantity of meth.

For that reason, I don't find that the $1440.79 should be forfeited.

With regard to the Camaro, he continued:

... there were some pills found. There were [sic] some hashish, .86 of a gram found in the car, this Marlboro box in the console. There is no evidence of any attempt to sell that that [sic] particular night of any real direct testimony as to the sale from this car.

An order directing return of the car and money to Bruno was subsequently entered and this appeal ensued.

The forfeiture statute provides:

a. Any interest in the following shall be subject to forfeiture and no property rights shall exist in them:

. . . . . . . .

(2) All property which has been, or is intended to be, utilized in furtherance of an unlawful activity, including, but not limited to, conveyances intended to facilitate the perpetration of illegal acts, or buildings or premises maintained for the purpose of committing offenses against the State.

(3) Property which has become or is intended to become an integral part of illegal activity, including, but not limited to, money which is earmarked for use as financing for an illegal gambling enterprise.

(4) Proceeds of illegal activities, including, but not limited to, property or money obtained as a result of the sale of prima facie contraband as defined by subsection a. (1), proceeds of illegal gambling, prostitution, bribery and extortion. [*N.J.S.A.* 2C:64–1(a).]

On this appeal the State urges that this statute applies to any and all unlawful and illegal activity and that the trial judge therefore erred in refusing to grant forfeiture of items connect-

ed with a possessory narcotics offense. While we believe that the trial judge's interpretation of the statute was too restrictive, we view the State's position here as an over broad statement of the law. More finely honed analysis leads us to a middle ground on the issue of the scope of applicability of *N.J.S.A.* 2C:64–1(a).

■■ Obviously, every unlawful activity or illegal action was not intended to trigger the forfeiture provisions of the statute. For example, traffic infractions, though literally within the scope of *N.J.S.A.* 2C:64–1(a) are rationally outside its intendment. While the forfeiture statute has "an extraordinarily broad scope," forfeitures are disfavored in the law (*State v. One 1979 Pontiac Sunbird,* 191 *N.J.Super.* 578, 584 (App.Div. 1983)), and the statute should be strictly construed "in a manner as favorable to the person whose property is to be seized as is consistent with the fair principles of interpretation." *State v. One (1) Ford Van Econoline,* 154 *N.J.Super.* 326, 332 (App. Div.1977) (quoting 37 *C.J.S. Forfeitures* § 4b); *see also, State v. 1979 Pontiac Trans Am,* 98 *N.J.* 474 (1985) (collecting and reiterating these principles).

The question here is what meaning should be ascribed to the terms "unlawful activity" and "illegal acts" in the forfeiture statute. Guidance is available in the case of *Sawran v. Lennon,* 19 *N.J.* 606 (1955) where the Court affirmed a judgment directing the return of forfeited hunting rifles to owners who had been convicted of statutory violations carrying monetary penalties. *Id.* at 609–610. The forfeiture statute in *Sawran,* *N.J.S.A.* 2A:151–16, was one of the source provisions of the current statute and provided, in pertinent part, that "[n]o property right exists in firearms unlawfully possessed, carried or used." In interpreting this statute the Court was faced with a similar question to that presented here: what are the kinds of unlawful uses which will justify forfeiture? In answering this question the Court carefully delineated the differences among the three categories of public offenses—indictable offenses,

quasi-criminal disorderly persons offenses and offenses punishable by penalties—and held that:

> [I]n providing for a forfeiture of firearms by reason of their unlawful possession, carriage or use, the Legislature intended to cover only criminally unlawful acts, and not acts which were less than criminal or which carried only pecuniary penalties. [*Id.* at 614.]

We believe that the distinctions between classes of illegal or unlawful activities underscored in *Sawran* for forfeiture purposes are equally applicable here and that *Sawran* is authority for the proposition that *N.J.S.A.* 2C:64–1(a) applies only to crimes, *i.e.*, indictable offenses, and not to disorderly persons offenses and we so hold.

Applying this standard, the first question is whether the Camaro should have been forfeited. The police found .86 grams of hashish in the car. Since possession of less than five grams of hashish is a disorderly persons offense and not a crime (*N.J.S.A.* 24:21–20(a)(4)), the presence of that small amount of hashish afforded no basis for forfeiture. The police also found drug look-alikes in a Marlboro pack in the console of the car. The trial judge apparently accepted Bruno's story that these look-alikes were in fact caffeine which he used personally to "keep him going." There was sufficient evidence in this record to justify that factfinding, and accordingly we will not interfere with it. *Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474 (1974). Because mere possession of look-alikes is not a crime without a concomitant "intent to distribute" under *N.J. S.A.* 24:21–19.1(a), the trial judge correctly ruled that, on the facts as he found them, forfeiture would not lie.

Bruno, however, admitted possession of methamphetamine and possession of methamphetamine with intent to distribute, both indictable offenses and high misdemeanors punishable by five years imprisonment and a fine of $15,000. *See N.J.S.A.* 24:21–20(a)(1) (possession); *N.J.S.A.* 24:21–19(a)(1) and 24:21–19(b)(3) (possession with intent to distribute). Applying the rule established in *Sawran*, which we adopt here, both of these crimes would constitute "unlawful activity" or "illegal

acts" within the meaning of the forfeiture statute, *N.J.S.A.* 2C:64–1(a)(2). Since the Legislature views the possession and distribution of methamphetamine as crimes of equal gravity, there is no basis for the "mere possession" distinction drawn by the trial judge.

■ While methamphetamine possession and distribution meet the test of unlawful or illegal activity, this alone does not justify the forfeiture of the car. The State is required to meet the additional burden of showing that the Camaro was "utilized in furtherance of" or "to facilitate" the criminal possession, or has "become an integral part" of illegal or unlawful activity. *N.J.S.A.* 2C:64–1(a)(2) and (3). Here Bruno's use of the Camaro was not shown to bear any relationship with the unlawful methamphetamine activities.

■ These facts are similar to those which were considered by the Court in *Ben Ali v. Towe*, 30 *N.J.Super.* 19 (App.Div. 1954), where 30 packages of cocaine were found in the driver's clothing and he was charged with possession. The statute then in effect, *N.J.S.A.* 24:18–38.1, provided for forfeiture of a vehicle "used in, for or in connection with the violation" of the drug laws. The court held:

> ... [W]e hardly think the Legislature in passing a confiscatory statute "for the repression of the *crime*" sought the forfeiture of vehicles, the use of which had no relation whatever with the crime, save a mere coincidence in point of time. To support such a construction of the statute, its terms would have to be clearer than they are.
>
> We thus are brought to the view that the prepositional words in the phrase, "used in, for or in connection with the violation," all refer to a tie of causality or dependency; they represent varying degrees of proximity in the relationship between the use of the car and the violation. The car here, so far as the record goes, did not, in the slightest degree, aid Green in committing the crime; the crime was not in any measure dependent on the car. The prosecutor therefore has not made out his defense. [*Id.* at 24.]

See also *State v. A 1971 Datsun*, 139 *N.J.Super.* 186 (App.Div. 1976). As in *Ben Ali*, Bruno's possession of methamphetamine in his pocket therefore afforded no basis for a forfeiture of the car. We accordingly affirm the trial judge's order that the Camaro be returned to Bruno.

█ With respect to the $1440 we have reached a different conclusion. We are well satisfied that the facts elicited by the State with the respect to the currency met the standards for forfeiture. Significantly, the $1440 was found on Bruno's person together with methamphetamine with respect to which he pled guilty and was sentenced for simple possession and possession with intent to distribute. The illegal or unlawful activity requirement was thus established. Bruno also had in his possession, at that time, initialed papers which the officers concluded were evidence of drug transactions and, in fact, he admitted to the officers that he had been trafficking in large quantities of methamphetamine, marijuana and quaaludes. Further, when the $1440 was discovered, Bruno gave absolutely no explanation as to its presence with the drugs on his person. On this backdrop we are at a loss as to the refusal of the trial judge to order forfeiture of the cash. In our view, the trial judge erred when he said that Bruno met his burden as to the money "simply because ... the plaintiff hasn't been able to prove anything...." We believe that the State proved that the money was either an integral part of a conceded illegal activity (drug trafficking) or the proceeds thereof and that forfeiture was thus justified under *N.J.S.A.* 2C:64–1(a)(3) and (4). Accordingly, we reverse and remand for the entry of an order requiring a forfeiture of the currency.

Affirmed in part; reversed in part.

FRITZ, P.J.A.D. (concurring).

I concur in the opinion of Judge Long because I am satisfied that controlling precedent demands the result and I am satisfied that the statute as presently written might reasonably be construed and interpreted in the manner in which the opinion of Judge Long considers it. Be all this as it may, I am left with a lingering doubt respecting the intent of the Legislature as far as the nature and extent of the necessary nexus between illegal activity and the property sought to be forfeited is concerned (especially in the circumstances present here where I have no

doubt at all that the automobile facilitated the crimes which were admitted by the defendant). That doubt, of course, should not inure to the detriment of the defendant, both according to precedent and according to my own convictions.

I undertake this concurring opinion nevertheless in order that my doubt may be recorded and that the matter may be expressly brought to the attention of the Legislature in the context of the circumstances of this case. By the consequent action or inaction of that body doubt can be finally removed.